Good morning. My name is Robert Lundman. I represent the Forest Service. I'm going to take 12 minutes of our side time and reserve three of those for rebuttal. Ms. Weiss, representing Intervenor Appellant, American Forest Resource Council, will then have eight minutes. In 2017, the Abney Fire burned about 10,000 acres in the Klamath National Forest. About half of the damage was severe. The result was an increased risk of another catastrophic wildfire that would endanger the public, firefighters, and forest workers, and increased risk to important old-growth habitat. Why was the result of the fire an increased risk of more fire? Can we get to any of this? We asked you to tell us about the present condition as to whether this case is moot or not. Right. So with respect to the preliminary injunction, by November 10th, all of the project work that plaintiffs sought to enjoin will be done. There's some remaining work on the copper sail. That's one of the two things they sought to enjoin. There are two units there. There's 49 acres of work removing firewood that's taking place this week. That will be done by November 10th. That work will then be done, the copper sail work. The other component they sought to enjoin was the B Camp roadside hazard tree removal, and that work is already done, the commercial work there. So we're close to mootness. We're not quite there yet. There's a window of time here, but we're happy to update the court when we get to the point where all of the work is complete. Okay. Thank you very much. And just to underscore, the order the court cited at Kena sets forth that the right frame of analysis here is not the case as a whole, but what they sought to enjoin. And the declaration from Ms. Brown, the district court, sets out very clearly these are the two things they sought to enjoin. That's what the district court then enjoined, but then stayed. As to the injunction, we think the district court's most substantial error here is on the public interest prong, that the court just failed to meaningfully address public interest. Under the Supreme Court's decision in winter, that's a mandatory step in the analysis before the court can grant an extraordinary remedy of a PI. Were there any on-record comments other than what's in the written order about this, about the emergency, need for access, anything like that? I think the court was aware of them. It just was missing from the analysis section. Analysis section, forgive me. Analysis section in the written order only, but I was asking, I've read the written, of course we all have. Right. But were there any on-record statements that would indicate that? I'm not aware of any. I've skimmed through the transcript. I don't recall if there was any further analysis of that in the transcript. Okay. Thank you. But the order itself just fails to contain that analysis. Then when the court did look at it and discuss it in the stay order, it said the public interest here is in favor of this project going forward. It credited the Forest Service's analysis of the risk to the public and the important role that the salvage harvest here, and the copper sale, and the hazard tree removal on Peat Camp Road, explain why that's important and why it should be going forward. The other part of the public interest beside those two is that this project will restore old growth conditions in the project area about 130 years earlier than natural regeneration. And so this is a project that both has these important public interests and public safety aspects, but also is going to result in a healthier forest with old growth conditions much sooner than natural regeneration will. As to irreparable injury and the balance of harms, the district court first erred here by presuming that logging causes irreparable injury. The court then did cite plaintiff's recreational interests, but here that recreational interest is diffuse, and the project area itself, 88% of it is going to be left to natural regenerate, and that's what plaintiff's interest is in. So the vast majority of the project area, the 10,000 acres we're talking about, plaintiff's will still be able to recreate in without any impact by the Forest Service's actions here. When you talk about balance, it's even clearer, and that's what the district court relied on in its stay order, that the recreational interests of plaintiff's is outweighed by the public interest in a safer forest, in a forest that regenerates faster, and the safety of the forest workers and the public who use the road, that's at issue here. On to the merits, the district court here, I think, just missed a good chunk of the Forest Service's analysis in the environmental assessment and the Northern Spotted Olive Report. As to the National Forest Management Act, the project is consistent with the aquatic conservation strategy, which is part of the Northwest Forest Plan. The Forest Service here thoroughly analyzed both the project site, its natural condition, its condition after the fire, and then finally its condition that would be in place after the project. And the agency concluded and explained that the short-term impacts here would not be significant, and would lead to long-term restoration and improvement in water quality in terms of sediment, and that's all that the ACS requires, maintaining or restoring water quality, and the project here will restore water quality in the long-term with only minor short-term impacts. As to snag retention, snags are the standing dead trees that remain after this sort of fire. The Klamath Plan here is a specific numerical standard, and the Forest Service's analysis shows that it's going to be double that standard. And then the project also complies with the Northwest Forest Plan's more generalized guidance about suitable habitat for the Northern Spotted Owl. The project here destroyed a lot of that habitat. I mean, the old growth that was burnt down and that's now severely damaged is at best marginal foraging habitat now for the Northern Spotted Owl, and because the project's going to lead to restoration sooner, 130 years sooner about, that's going to result in a benefit to the owl over time. As to the National Environmental Policy Act, the district court erred in concluding that there's a serious question as to whether an environmental impact statement is required. The district court just cited back to its National Forest Management Act analysis, but as I've explained, there's no violation there. That analysis was fine, and so you're building on a faulty foundation. In any event, it's not enough just to cite to the other statutory issue and say there's a de facto requirement for an environmental impact statement. Rather, the court should have analyzed the significance factors that set forth when there is an intense enough impact to require an environmental impact statement. The Forest Service did that analysis. It's an environmental assessment. It starts at Forest Service excerpts of record 118. It walked through all the 10 factors, and the district court here just didn't engage with that analysis. So just to sum up, and I'm happy to answer any questions, but we think we're close to mootness. Public interest and balance of harms here very much weigh in favor of this project continuing to go forward and vacating the preliminary injunction. And the merits analysis the Forest Service did here with respect to both aquatic conservation strategy, snag retention, was thorough and complete, and the record really backs that all up. So unless you have questions about the preliminary injunction, we think it should be dissolved and reversed. I'll reserve the balance of my time. To what extent did the district court's stay order not reverse the preliminary injunction? As a functional matter, it stopped the preliminary injunction, so there's nothing enjoining the Forest Service right now. As a legal analysis matter, it came out differently on public interest and balance of harms and said that's the main reason it's doing so. On its merits analysis, it was kind of a mixed bag. It still said it thought there's a problem with the aquatic conservation strategy, for example, and I don't think that's correct. I suppose I probably didn't phrase my question correctly. If we were to agree with the district court's stay order, that would satisfy you? Yes, even though I think the result of that should be that the preliminary injunction should be dissolved and set aside. Well, as a procedural matter, you're absolutely right. Right, but in terms of coming to a different result, I think you can agree with the district court's order and say the preliminary injunction should be reversed for the reasons the district court gave in its stay order, and that gets us to no injunction. I do think the district court has to throw one thing out there about the aquatic conservation strategy. The district court said the Forest Service still hasn't explained natural range of variation and cited to the appendix, which is appendix C to the EA, but it overlooked the actual analysis in the EA itself, which is that excerpts of record from the Forest Service of 96 and 97 and 99 and 100. In those places, the Forest Service explains that no, the changes here from the project are within the natural range of variation for all of the Forest Service's empirical models. And so that's what the district court missed in its stay order, and we think that shows that on the merits as well that the Forest Service here has complied. Can you give me the citation of that again? It's 96, 97 and 99 and 100 of the Forest Service's excerpts of record. Then appendix C is 145 to 158, but if you read the EA pages first and then the appendix, they work together, I think the district court may have just skipped to the appendix and found something missing that's back in the first pages. Thank you, Mr. Leibniz. Thank you. May it please the Court, my name is Julie Wise, and I represent the American Forest Resource Council, or AFRC, the intervener appellant in this case. With me today is Mr. Lawson Fite, AFRC's general counsel, and AFRC today urges you to conclude that this case either is moot, and I'll explain why I disagree a little bit with Forest Service counsel, or alternatively to reverse the district court's preliminary injunction. Your Honor, regarding mootness, Your Honors, you asked us to talk about the Akeena v. Hawaii case, and we agreed that under the unusual circumstances in this case where the preliminary injunction was granted and then actually stayed by the district court, the district court effectively cured the problem, and the appeal is moot from our perspective. The activities that were the focus of the preliminary injunction were discrete activities, and those were area salvage harvest and also the removal of certain hazard trees along the Bee Camp Road. There's no dispute that the Bee Camp Road hazard trees have been removed. From our perspective, because the only activity remaining under the copper timber sale is some firewood removal in two units, firewood removal, because that was not a focus of the injunction, Your Honors, the focus was area salvage under the theory of Akeena that the particular focus of the preliminary injunction has now ceased, those activities have ceased. AFRC does take the position that this case, the appeal is moot, regardless of whether the underlying case has some vitality. The firewood removal is firewood that's already on the ground? No, Your Honor. I believe some of the trees will need to be felled, but firewood removal was not the focus of K.S. Wild's appeal. And even if the court disagrees, the case will be moot very quickly because the firewood removal is ongoing this week. Counsel for the Forest Service indicated it will be done within about the next three weeks. We think if the weather cooperates, it will actually be done in about two weeks. So the case is essentially moot. Counsel, you said it two different ways. You said it's not the firewood removal is not the focus of your appeal. Is it a part of the injunction? Is it part of the enjoined activity? The parties never focused on firewood removal in the district court. Counsel, my question is more specific than that, and it matters to me on the mootness analysis. So if you could answer that question, it would be helpful to me. Your Honor, perhaps we have to ask K.S. Wild, the appellee, to answer that question, because from our focus, area salvage, going through and actually salvaging large units, was the focus of K.S. Wild's appeal. Firewood removal is a different and more discreet activity. It does involve the felling of dead and dying trees. We acknowledge that. So let me ask you this. Yes. Was the firewood removal part of the district court's initial preliminary injunction? Firewood removal was never discussed, Your Honor. The parties focused exclusively on area salvage, and it wasn't clear. As long as it's part of the order that he entered, that the district court entered, then it's not moot, and that's what I'm trying to get at. Regardless of what folks discussed, doesn't the order cover it? Your Honor, the order does not address firewood removal at all. So in order for the order to actually cover firewood removal, the area salvage component of the injunction would have had to have encompassed firewood removal. And if, in fact, it did, that activity will be complete within two to three weeks. That's helpful to me. Thank you very much. Yes, thank you. I would like to briefly address an argument put forth by K.S. Wild in their declaration filed last week. They filed a declaration under the guise of a 28-J notice, basically saying that this appeal would not be moot because of the capable of repetition yet evading review exception to mootness. We disagree that that could apply in this case because one of the reasons for that exception is that the activity that's being challenged is of such a short duration that it can never be reached within the course of the litigation. But in this case, in the district court, K.S. Wild did not pursue its appeal, excuse me, did not pursue the merits of its case after obtaining the preliminary injunction in January. And, in fact, in July, the parties stipulated to a stay of the district court proceedings pending the outcome in this case. So on these facts, the capable of repetition yet evading review exception to mootness would not apply. Your Honors, even if you don't think this case is moot, we agree with Forest Service Counsel that the district court abused its discretion in entering the preliminary injunction, which it then cured by issuing the stay order. But it's very clear that the district court abused its discretion by misapplying the law. The district court did not, either in its order or, Your Honor, at the hearing, address the public interest factor or address the balance of harms. It very clearly focused only on serious questions on the merits and the likelihood of irreparable harm. And in doing so, the district court collapsed that four-part test for a preliminary injunction into a two-part test. All K.S. Wild had to demonstrate was serious questions on the merits coupled with the likelihood of irreparable harm. And the record is clear that that's all the district court required. And that runs contrary to the admonitions of this court and the Supreme Court that the public interest and balance of harms elements must be considered. If the court had considered those things, it would not have issued a preliminary injunction. And, in fact, when it issued its stay order, it reached that very conclusion. The district court explicitly recognized that the threat to public safety, should the injunction remain in place, warranted the stay of the injunction. The record very clearly supports this, and we would particularly refer Your Honors to the amicus brief of Siskiyou County. That's the county within which the project is taking place. Is it your point that in the stay order the court also, district court also, balanced the equities? Yes, Your Honor. We do believe the court balanced the equities. What did he say about that element? Your Honor, I believe that he focused primarily on the public interest element and determined that that was sufficient for balancing the equities. Perhaps, Your Honor, there needed to be more discreet focus on balancing the equities, but he very clearly recognized that the public interest element did not support an injunction and did warrant a stay. You're not taking the position that even in the stay order he didn't balance the equities? No, Your Honor, we are not. And I'm going to very briefly, Your Honors, address the National Forest Management Act snag removal issue. That was the issue challenging salvage harvest in a late successional reserve. The district court actually reversed course on this when it issued its stay order. And very quickly, Your Honors, the court and K.S. Wilde rely on the Brong case out of this court. This case comes up repeatedly, and so I would just like to briefly remind the court that Brong is factually distinct and factually distinguishable. It involved a different forest than the Klamath. It involved a different forest plan. It involved a different snag methodology. And it did not involve the fire regime at issue in this case. On this forest, snags do not stay standing for 80 years, which is the amount of time it takes for late successional habitat to regrow. And to the extent that K.S. Wilde would assert that this Brong decision is a bright-line rule that you can't remove snags from a late successional reserve, it's important to recognize that when this court issued its en banc lands council versus McNair decision, it abrogated the reasoning underlying Brong. Brong was a highly non-deferential opinion, and it did try to create sort of a bright-line rule about snag removal. But in lands council versus McNair, Your Honors, the Ninth Circuit said it's improper to create bright-line rules regarding how an agency has to satisfy the requirements of the National Forest Management Act. So to the extent K.S. Wilde continues to assert that Brong created the law that you can't remove snags from late successional reserve, it has been effectively overruled by the McNair decision, that reasoning can no longer stand. McNair was an en banc decision. Brong was a three-panel decision. And Brong is no longer good law. So, Your Honors, we would simply ask you to conclude that this case is moot, and if you don't think it's moot, to reverse the district court's grant of a preliminary injunction. Thank you very much. Ms. Weiss. Thank you, Your Honors. My name is Susan Jane Brown with the Western Environmental Law Center. I represent Appellee's Kalamazoo Wildlands Center at all in this matter. I'd like to reserve five minutes for rebuttal, please. Thank you. Your Honors, I'd like to start with mootness this morning. Oh, you're the appellee. I assume that they are going to speak after I do, or did they use all of their time? I couldn't see the clock. I'm sorry? They used all their time. Oh, they did. Okay. Oh, we've got one minute. Okay. All right. Thank you, Your Honor. Pardon me. No problem. So, Your Honors, I'd like to start with mootness this morning. First of all, it is important to note that all of the logging that K.S. Wild challenged in this, in our preliminary injunction motion, is not going to be completed. The harvest will not be completed by November 10th. I believe what the Department of Justice is intimating is that the purchaser option units that the purchaser has elected to harvest may be finished by November 10th. But as we indicated in our 28J motion, or a letter that we supplied to the court, there are a number of purchaser option units that will not be harvested by November 10th. We've made those allegations in the third declaration filed by George Sexton. So there is logging that will not be completed by November 10th. It's important to note that we did challenge all of the area late succession reserve logging in the copper timber sale, and many of those units will not be harvested by November 10th. I also believe that the units that the Forest Service deferred because they located a goshawk nest, an active nest, in some of the harvest units, those units will also not be harvested by November 10th. Therefore, logging that we challenged in our preliminary injunction will not be complete by the middle of November. Therefore, our appeal or our request for our injunction to be reinstated is not moot. So it's not just that you challenged those things, those component parts of the project in your complaint. They were in your preliminary injunction, and you interpret the court's preliminary injunction to have enjoined them. Is that right? Correct. Okay. That's right. And even if those units were complete, but we allege that they will not be complete by November 10th, completion of an activity is not the hallmark of mootness. As this court held in Northwest Environmental Defense Center v. Gordon, 849F2-1241, 9th Circuit, 1988, quote, completion of an activity is not the hallmark of mootness. Rather, a case is moot only where no effective relief for the alleged violation can be given. And in this case, and the 9th Circuit case law goes on to explain that there are many ways that exceptions to mootness would apply. So, for example, in this court's case, neighbors of Cutty Mountain v. Alexander, 303F3-1059, 9th Circuit, 2002, this was a logging case as well where the challenge logging actually was complete. But the court can order actual additional relief, either equitable relief, ordering the Forest Service to undertake future activities to mitigate the past harm that was done by the logging. We've also pled declaratory relief or a request for one in our complaint. And, again, as this court in Natural Resources Defense Council v. EPA has held, that requesting broad relief and, as well, a request for declaratory relief, which, quote, delineates important rights and responsibilities and can be a message not only to the parties, but also to the public and has significant educational and lasting importance. That when declaratory relief, for example, the Forest Service violated XYZ laws for these reasons, that kind of declaratory relief can have a very important public and agency message. KS Wilde has pled such broad relief in our complaint. Declaratory relief from this court or from the district court remains possible, as does equitable relief. For these reasons, we do not believe that our appeal or this appeal will be moot, even if logging was completed on November 10th, which we dispute. So returning now to this appeal, which is a little bit odd, it is an odd procedural posture. What Klamasiski-Wildland Center is taking issue with is the district court's stay order that stays the injunction, so basically an injunction on an injunction. So that's the posture that we're faced with here today. In entering that stay order, the district court committed reversible error in a number of respects. A district court rebuses its discretion if its decision was based on, quote, an erroneous legal standard or clearly erroneous finding of fact. So your position, counsel, is that the stay of the preliminary injunction was an abusive discretion? Correct. Why? For several reasons. Okay. So the first reason is that in the district court's stay order, he specifically said that the district court, quote, must defer to the Forest Service's assessment of the equities of a stay pending appeal, whereas this court's case law in Sierra Forest Legacy v. Sherman, 646 F3rd 1161, is actually the opposite, is that district courts owe no deference to an agency regarding the equitable relief and balancing issue. And so the fact that the district court specifically said, I must defer, when in fact the case law is the opposite, that he must not defer, that is reversible error because the court based his decision on an erroneous legal standard. Where did he say that, counsel? He said it in his stay order on page 10 on paragraph or, excuse me, line 6 and 7. Weighing these four factors, the court finds that the factors tip in favor of defendants, period. I see. Yeah. Yeah. So he specifically deferred to the Forest Service's balancing of the equities when no deference is due. The second piece of reversible error is that the district court, again, in his stay order, entertained and accepted as true unsupported allegations and post hoc rationalizations about the effect of the narrowly tailored injunction that plaintiffs sought and originally secured in this case. We took a page out of the Ninth Circuit's case law and did not seek to enjoin the roadside hazard tree removal that has direct links to public safety and administrative efficiency. We didn't challenge that. What we actually challenged was the area salvage logging that has the most ecological impact and also was of greatest concern to my clients. Not their only concern, but their greatest concern. And we wanted to narrowly tailor what we wanted for relief in the preliminary injunction phase of this case. But isn't the area salvage logging co-located? Isn't that where the corridor is? No. So if you look at the maps that have been supplied, the maps are outlined, and you can kind of see a little snaky corridor that goes around the roads. That's the roadside hazard tree removal that we did not challenge. And then adjacent to those areas, you'll see kind of more blocky areas, and those are the actual unit. That's what we call the area logging. We challenged that area logging in the copper timber sale. We did not challenge the area logging in the low gap sale, which are much more acres there. They were closer to town. We thought that our argument around public safety was not strong there, so we didn't challenge that. So we actually allowed quite a bit of logging to go forward and narrowly tailored our request for relief here. On the other hand, the Forest Service, particularly Defendant Patty Grantham, filed several declarations with the district court alleging the economic harm that would result to the government if the area logging that we challenged in the preliminary injunction, so not the roadside stuff where there are highly lucrative, very large trees, or in the low gap sale. So that, again, that went forward. Ms. Grantham's statements were that every aspect of this project had to be implemented in order to recoup money in order to pay for what we consider to be the white hat aspects of this project, hazardous fuels reduction, prescribed burning. Those things we have not challenged either in our complaint or our request for preliminary injunction. So we narrowly tailored our injunctive relief, but there is no evidence in the record, in the administrative record for this case, that says anything about economics and whether or not any amount of income that would come from the Syad horse project would be sufficient to carry out those activities. And so we have the Forest Service making unsupported allegations that they need every dollar possible to implement these other projects, and the narrowly tailored injunction would preclude that. So we need evidence in the administrative record, as this court has said time and again, quote, and this is from Oregon Natural Desert Association v. Bureau of Land Management, the court cannot defer to avoid, end quote, the courts may not accept appellate counsel's post hoc rationalizations for agency action. It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself. And here we don't, the administrative record has not a single piece of information about the economics of this project. And because the district court clearly relied on those claims of economic harm to the Forest Service for the basis of its stay order, that is also reversible error. The third aspect of reversible error here relates, again, to the allegations of the Forest Service that a narrowly tailored injunction may result in the project becoming permanently futile. As this court well knows, may is actually not the standard for achieving injunctive relief. And because the Forest Service was arguing for an injunction of the injunction, a stay of the district court's order, the Forest Service also has an obligation to show not a mere possibility, but a likelihood of economic harm from the injunction. And as I just mentioned, there is no economic information in the administrative record for this case. And therefore, the Forest Service's claims of harm, which comes into play in the balancing of the equities, is based on no information at all, no admissible information in the administrative record. And then finally, the district court in its stay order applied an erroneous legal standard and or made a clearly erroneous finding of fact that suitable habitat, this goes to the National Forest Management Act claim regarding snag retention in the late succession reserve, but he made an erroneous finding of fact that suitable habitat, which is actually a term that is applied generally to listed species and their critical habitat, is equivalent to habitat suitability as measured and protected by the Northwest Forest Plan. Now, those words sound very similar, but they are actually quite different. And I'll move on to discussing that in the merits of our argument. So turning first, though, to the balance of harms in the public interest, the district court's original preliminary injunction order was fairly cursory. It's true, and that's usually what we see in these types of injunctive relief orders. But that's not to say that the court did not consider those factors. He simply didn't find them very persuasive. It was clear at the injunction hearing that he was much more interested in the merits of the plaintiff's case but not that he was oblivious or, frankly, did not consider those issues at all. He made a finding in his injunction order, and he reversed that finding in his stay order. These were issues that were definitely pled before the district court. The district court was well aware of them. He just simply didn't find them very persuasive, and his order is clear that he didn't find those persuasive. And because he found the merits findings so strong under both Winter and Cottrell, the district court indicated that an injunction should issue, at least initially. Returning to the merits of the case, and I want to start with the aquatic conservation strategy claim here. The aquatic conservation strategy requires the Forest Service to comply with the aquatic conservation strategy at all spatial. Before you get to the merits, if you admit that Judge Dunley made a cursory finding regarding the balance of harm and the public interest in the preliminary injunction and reversed himself in the stay order, I think you skipped over an issue that was in my mind. Was he wrong in the stay order? I think he was wrong in the stay order. Why? He was wrong in the stay order, Your Honor, because he relied on information that doesn't exist. He first said that he must defer to the Forest Service, which is an erroneous legal standard to apply. And then second, what he found persuasive was the allegation that the injunction would preclude the rest of the project from going forward. I see. Which you've been discussing up to now, the four points that you made. Correct. All right. Thank you. Yes. Counsel, I have a question for you. I want to make sure I'm looking at the map that you want me to be looking at. I have a map that on the back of it it says Exhibit A, and I think it was attached to your declaration? Yes. Okay. Is that the one we should be looking at? So what you should be looking at is the 28J letter that we submitted. It's the third declaration of George Sexton. Yep. And his Exhibit A is that map. Right. And so if you look, one, two. George Sexton, I have it October 15th. I've got it right here. But it just seems to me that you think there isn't a proximity to the road that is a concern here? I'm sorry, I don't. And I would say earlier when I was talking about proximity to roads that you think there were challenge portions, that you didn't challenge portions of the project that were proximate to the roadway. Is that right? Correct. So, for example, and that's really hard to see, but Unit 3840, for example, which is in the northwest sort of chunk of the Copper Butte, if you look at Copper Butte right below there. Where it says Copper Butte. Yeah. Those shaded areas are those purchaser option units, for example. So those have not been harvested. Okay. So they're shaded like four different ways. I know. There's one that's sort of a dark blocky gray. Not that one. The one to the right. There's a crosshatch one to the right. And then there's a wavy line. Speckled one. I don't even have a speckled one. Do you see the crosshatch one that seems awfully close to the road? Not sure. Right under the words Copper Butte. Yes. Is that not part of the project? Am I misreading the map? That is part of the project. That is a site-specific protection measure. So that's a snag retention unit. So that actually will not be harvested either. But you can also see how this goes to our merits argument about snag retention. That's a snag retention unit that's outside of the other harvest units. So right below that crosshatch, you see the speckled one? I've got one. It says 38 in a circle. I can't take your word for it that those are speckled, but I see 38. And 38 and 40. And 40 next to it, for example. So those are timber subject to agreement units. Those are purchaser option units that the purchaser need not accept. And based on our field visit of October 9th, those units remain standing. And I do not believe that those will be harvested by November 10th. Okay. So this is part of your argument. These units, 38 and 40, are why you think. It's not moot. We talked about mootness. Correct. All right. Because they're not harvested yet. And they are authorized by the decision notice in this case. Okay. As long as they remain authorized by the decision notice, they could be harvested. So if you can follow the road around to me, you see where it says West Fork on sort of the right-hand part of the map? Yes. And those are really tiny numbers. Yes, they are. Is it 46? Yes. 48 maybe? It's 44, 46, 48. Those also look approximate. Correct. Those are also purchaser option units. Okay. And what about up to, I think it's 10. It looks like 10. You see where it says 43 and then to the left? Yep. What is the status of those? So it is confusing. I believe 43 is a purchaser option unit. I think R10 is a roadside. So those say area sale boundaries, that dotted line, area sale boundary? Yes. Do you know the status of these units? I don't want to take up all your time, but do you know the status of these? I don't know about unit 10. What about 44 and 46? 44 and 46, I believe, are unharvested. Okay. Fair enough. Thanks for the detour. Yeah. No, the map is a little tricky to see. I see that my yellow light is on. Is this for my initial time? No more rebuttal then? Okay. I'll go ahead and finish then. Returning to the National Forest Management Act, the Aquatic Conservation Strategy claim, it's very clear that the planning area is already in a degraded condition. The Forest Service used three models to assess sediment impacts to the project area as a result of the project. All three of those models predicted substantial increases in sedimentation as a result of the project, up to 130% increase. The Aquatic Conservation Strategy was built to preclude this kind of increase because if you have these sorts of site-specific increases, at the watershed scale, you'll have a degradation of salmon habitat. And that's what the Aquatic Conservation Strategy was designed to prevent. Looking at the large-diameter snag removal from late successional reserves claim, this is also a National Forest Management Act claim, it's very clear that snags are being retained in no-harvest areas. We just discussed that on the map. This is what the Ninth Circuit in the Braun case, one aspect that the court found to be improper, basically by averaging snag retention over a large area. But I would also point out that the standard and guidelines from the Klamath National Forest forest plan that's been at issue in this case doesn't apply to spotted owls or mammals. It only applies to cavity excavators, like woodpeckers. So the standard that the Forest Service maintains it adhere to was actually not the correct standard to be complied with in this case. And then finally, moving to habitat suitability. It is clear that the Northwest Forest Plan talks about habitat suitability for all wildlife, and we provided those citations in our brief. But specifically regarding the northern spotted owl, the Forest Service was also clear in the administrative record that the project would degrade spotted owl habitat well into the future as well as immediately post-project. Again, the Northwest Forest Plan prohibits this kind of change in habitat suitability, and therefore the district court, on its state order, should have held in plaintiff's favor on that claim as well. As it did, it found that we made our ACS claim as well as our NEPA claim, and that this was enough to award the injunction in the first instance. We asked the court to reinstate that injunction on appeal. Thank you. Thank you very much. Do you have a minute for rebuttal? Thank you, Your Honors. As to mootness, the Forest Service is not going to harvest the units that are subject to further agreement. The contractor is not. Those will be done November 10th. If they haven't been harvested, they're not going to be harvested, so they're going to be moot. Plaintiff's declaration doesn't make any point to the contrary, and we will update the court when we get to that November 10th date or maybe before. The cases here are clear. Akeena is clear. You don't look at their whole claim and all their theories. You look at what they sought in the preliminary injunction. If you look at KS Wild ER, page 19, that's where Ms. Brown's declaration sets forth what they're seeking in the PI, and those things will be done November 10th, and the case will be moot. The posture of this case is confusing, but the stay order isn't on appeal here. It's the preliminary injunction that's on appeal. The stay order stays that injunction pending the appeal. So however you resolve the appeal, then the stay order will go away. They actually filed a notice of appeal from that, but we don't think that was proper either. Let me ask you this. Was there a cross-appeal of the stay order? Yes, they filed it. And also they sought an injunction pending appeal, which the motions panel denied after the district court stayed the PI. So they got full process on this. I see my time is up. I had two more points. Did I beat? Okay. Economic harm. If you look at – there's something in the record at AFRC ER 119 in the decision notice that explains the purpose of this project is not the economics. It's restoration. It's safety. But to get those things done, the Forest Service has to use a contractor who's willing to come in before the trees decline too much and are valueless. Same points also made at 183 and 184 of the AFRC ER. And then skipping quickly to the merits, they're confusing – the ACS comparison they're making is between the no-fire condition and what happened after the fire. If you look at the analysis starting at page 96 of the Forest Service's excerpt of the record, there is an analysis first of the no-action alternative, which shows the impact of the fire. Nothing's happening there. Here's what the fire has done. Then the next analysis is, well, let's add the project on top of that. And the 130% is based on the no-action alternative, the fire damage. The impacts from the project itself are much more marginal. They're not significant. In the long run, the project's going to improve the condition of the watershed by doing good work, but both to restore the forest and to remove other sources of sediment. Thank you very much, Mr. Lundman. Thank you. The court thanks counsel. And the case of Klamath-Siskiyou Wildland Center v. Patricia Grantham is submitted. And that ends our session for today. We will adjourn until tomorrow morning at 9 o'clock. Court is adjourned.
judges: Farris, Bea, Christen